MICHAEL HARRIGAN *vs.* CONNECTICUT RIVER LUMBER
COMPANY.

Hampden.    Sept. 28. — Nov. 23, 1880.    COLT & MORTON, JJ., absent.

Section 5 of the Gen. Sts. *c.* 78, providing that "no person shall cause or permit
to be driven or floated down Connecticut River, any masts, spars, logs or other
timber, unless the same are formed and bound into rafts and placed under the
care of a sufficient number of persons to govern and manage the same so as
to prevent damage thereby," is constitutional, even in the case of logs com-
ing from one State and passing through this Commonwealth on their way to
another State.

TORT for injuries to the plaintiff's pleasure boats, anchored
in the Connecticut River, or fastened to a wharf upon the plain-
tiff's land in Springfield, caused by floating logs, sent down the
river by the defendant, not formed into rafts nor attended by
persons to manage the same.    Trial in the Superior Court, be-
fore *Wilkinson*, J., who allowed a bill of exceptions in substance
as follows :

The plaintiff contended that as the logs were floated down the
river in violation of the Gen. Sts. *c.* 78, § 5,\* the defendant was
*prima facie* guilty of negligence.    The defendant contended that
the statute, so far as it affected this case, was unconstitutional
and void.    It appeared by uncontradicted evidence that the
Connecticut River was navigated from its mouth to Holyoke by
a transportation company with barges loaded with seventy-five
tons, drawn by steam tugs of fifty tons tonnage, but that the
tide did not ebb and flow therein in this State ; that the defend-
ant, incorporated in 1878, under the laws of Connecticut, pur-
chased and owned timber lands in the State of Vermont to the
extent of one hundred and thirty thousand acres upon the banks

---

\*  " No person shall cause or permit to be driven or floated down Con-
necticut River, any masts, spars, logs or other timber, unless the same are
formed and bound into rafts and placed under the care of a sufficient num-
ber of persons to govern and manage the same so as to prevent damage
thereby.  If damage is done to a bridge or dam upon or over said river,
by any timber so driven or floated in any manner not herein allowed, the
owner of the timber, and every person who causes or permits the same to
be so driven or floated, shall be jointly and severally liable for all such
damage, to be recovered by the party injured in an action of tort."

of the Connecticut River and its tributaries, upon which were six hundred and fifty million feet of lumber; that it owned a large steam mill at Northampton, in this State, on the said river, turning out sixty thousand feet a day, with an investment of $60,000; that it owned another mill of larger capacity at Holyoke, in this State, with an investment of $80,000, and still another at Hartford, in the State of Connecticut, of nearly as large capacity and capital; that its business was cutting, in the winter, the timber upon said lands, placing the logs in the Connecticut River in the spring, floating the logs down the river in drives of large quantities at a time to its different mills, sawing the logs into lumber, and selling the lumber in the market. There was evidence tending to prove that by reason of the rapids upon said river at Turner's Falls and Holyoke, within this State, it was absolutely impossible to comply with the first clause of said section, and to drive the logs in rafts over said rapids, and it must abandon the use of the Connecticut River if compelled so to do; that the defendant could unloose logs above rapids, and form them into rafts again after passing the rapids, but that the expense of so doing would be pecuniarily ruinous; that there was no other way of getting its timber into the markets of this State or of the State of ·Connecticut in any manner that was not ruinously expensive. It also appeared that the drives of logs generally occurred in July or August, and at intervals, — the logs running in the river for from two to four weeks, — and when so running, and at the time in question, substantially filled the river and prevented the use of it by pleasure boats, although the same did not intercept or prevent the large barges and steam tugs from the use of the river.

The defendant asked the judge to rule as follows: "If the jury find that, from the natural flow, current and bed of the river, it is impossible to bring and transport the timber of the defendant in the manner required by the Gen. Sts. *c.* 78, § 5, to its several mills, and from State to State, and place to place, and that the clause of the statute operates to destroy the defendant's business, and as a prohibition to the defendant of the use of the Connecticut River as a means and way of transportation, then the same is contrary to the Constitution of the United States, and is void. So if the compliance with the

provisions of the statute would be so expensive and onerous as to operate as an exclusion of the defendant from the river for the purpose of its business."

The judge declined to give any of the rulings asked for; but instructed the jury that the law was valid and operative in this case, and, if the plaintiff had sustained an injury by reason of an unlawful act on the part of the defendant without the plaintiff's fault, he was entitled to recover; that, if the logs were floated contrary to law, that was *prima facie* evidence of negligence; but if, upon the whole case, the jury were of the opinion that the defendant was not negligent, the plaintiff could not recover, and that the jury were to decide, under all the circumstances of the case, whether or not the defendant was negligent; and gave other full instructions pertinent to the case. The jury found for the plaintiff; and the defendant alleged exceptions.

*G. M. Stearns,* (*H. K. Hawes* with him,) for the defendant. 1. The Connecticut River is a great public highway between the States of Vermont, Massachusetts and Connecticut, and citizens of these States have the right to use it for the purposes of commerce and trade. *Commonwealth* v. *Chapin,* 5 Pick. 199, 202. *Adams* v. *Pease,* 2 Conn. 481. *Brown* v. *Chadbourne,* 31 Maine, 9. *Wadsworth* v. *Smith,* 11 Maine, 278. *Knox* v. *Chaloner,* 42 Maine, 150. *People* v. *Platt,* 17 Johns. 195, 211. *Hooker* v. *Cummings,* 20 Johns. 90. The driving of logs down the river from State to State for sale is navigation. *Brown* v. *Chadbourne, ubi supra. Treat* v. *Lord,* 42 Maine, 552, 561. *Carter* v. *Thurston,* 58 N. H. 104, 107. *Thompson* v. *Androscoggin Improv. Co.* 58 N. H. 108. And navigation is a part of commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189–191.

2. So far as § 5 of the Gen. Sts. *c.* 78, attempts to regulate commerce between the several States, it is in violation of the Constitution of the United States, art. 1, § 8. *Welton* v. *Missouri,* 91 U. S. 275, 282. *Foster* v. *New Orleans Port-Wardens,* 94 U. S. 246. *Inman Steamship Co.* v. *Tinker,* 94 U. S. 238, 245. *South Carolina* v. *Georgia,* 93 U. S. 4, 10. Whatever limits, impedes or affects transportation of property into or out of the country, or through the States, is a regulation of commerce, within the meaning of the Constitution. Any State legislation is void which creates an impediment to the free navigation

of public waters, or prescribes conditions in accordance with which commerce in particular articles or between particular places is required to be conducted. *Sherlock* v. *Alling*, 93 U. S. 99, 102. A State cannot tax passengers, as it is an attempt to regulate commerce, nor require a bond that an emigrant shall not become a pauper. *Henderson* v. *Mayor of New York*, 92 U. S. 259. *State Freight Tax case*, 15 Wall. 232. Nor require a bond that an emigrant is not a lewd woman. *Chy Lung* v. *Freeman*, 92 U. S. 275. Nor regulate the size or kind of vessel used in transportation. *Gibbons* v. *Ogden*, *ubi supra*. Nor tax an auctioneer's sales, if they include imported goods; nor discriminate against goods from other States. *Cook* v. *Pennsylvania*, 97 U. S. 566. Nor tax sales of products of other States by a pedler. *Welton* v. *Missouri*, *ubi supra*. Nor require hatchways to be surveyed. *Foster* v. *New Orleans Port-Wardens*, *ubi supra*. Nor prohibit the carriage of cattle from other States through any State except in a prescribed manner. *Railroad Co.* v. *Husen*, 95 U. S. 465. The rule seems to be that, if the legislation affects the modes and methods of foreign or interstate commerce, or impedes the same, it is void. If it simply declares the rights and duties of persons, it is valid, even though those duties affect the person's relations to commerce. *Sherlock* v. *Alling*, *ubi supra*. *Welton* v. *Missouri*, *ubi supra*.

It may be contended that this is only a police regulation. But it is settled that whatever laws a State may pass under its police power, if such attempts to legislate amount to a regula tion of foreign or interstate commerce, they are void. *Henderson* v. *Mayor of New York*, and *Railroad Co.* v. *Husen*, *ubi supra*. The law in question distinctly undertakes to regulate the navigation of the Connecticut River with logs and timber. It prescribes the conditions of the use of the river, " the modes and methods of the commerce," the " rules by which it shall be governed." And its regulations, rules, and conditions, as the case finds, amount to a prohibition of the river for the transportation between the States of this merchandise. It appearing that the statute in question does regulate and prohibit interstate commerce, it cannot be valid, allowing the greatest police power to the State, unless the plaintiff shows a grave necessity for the exercise of this power. The only pretence for the destruction

of this great commercial and important interest is, that from two to four weeks in the year the prosecution of the enterprise prevents pleasure boats from using the river.

*M. P. Knowlton & C. L. Long*, for the plaintiff.

LORD, J. At the trial, no question was made of the propriety of any ruling except one upon the provisions of the Gen. Sts. c. 78, § 5. The presiding judge ruled that any acts done in violation of that statute were *prima facie* wrongful; and the only objection made by the defendant to the ruling is that the statute is unconstitutional, for the reason that it is not competent for the Legislature of the Commonwealth to pass any law upon that subject, it being within the exclusive jurisdiction of Congress in the exercise of its power " to regulate commerce among the several States."

The chapter, of which the section in controversy forms a part, contains six sections, and the title is " Of timber afloat or cast on shore." The other five sections of the chapter guard very strictly the rights of property in logs, masts, spars and other timber which is properly floating in the river; and interference with such property is prohibited under highly penal provisions. The statute does not profess to take from the character of the Connecticut River that of a great highway, and it is not necessary to consider whether strictly that river is or is not technically " navigable waters." The tide does not ebb and flow therein within the limits of this Commonwealth, and dams and bridges by authority of the Legislature of Massachusetts have been erected over and across it in various places.

It is not, in our view, necessary to discuss the relative rights of Congress and the Legislatures of the several States to pass laws affecting interstate commerce. No question upon that subject can be raised upon the facts in this case, nor can any such question be raised under this provision of law.

When there is such a state of facts, or there are such provisions of law, as to raise the question of such relative rights, a discussion of the subject is always interesting, nor is it wholly free from difficulty; and, if we confine ourselves to the words used by different judges, there is undoubtedly an apparent conflict in adjudicated cases. It is not important to consider in this case how far such conflict is real, or only apparent. There

is no doubt that, upon such a stream as this, matters may arise which are subject to State legislation, or that the stream may be the means of such interstate communication as to authorize the legislation of Congress to regulate the commerce thereon.   In the comparatively recent case of *Railroad Co.* v. *Husen*, 95 U. S. 465, Mr. Justice Strong, in delivering the opinion of the court, uses this language : " While we unhesitatingly admit that a State may pass sanitary laws, and laws for the protection of life, liberty, health or property within its borders ; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, &c. from entering the State ; while for the purpose of self-protection it may establish quarantine, and reasonable inspection laws ; it may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection." This language is broad enough to cover a much wider field of legislation than this statute attempts.   As before said, this legislation does not attempt to deprive the Connecticut River of the character of a highway.   It does not interfere with any use of it as such, and all interstate commerce may be conducted over its waters with the same freedom as over its roads, bridges and other highways. If the Legislature had ordered that the Connecticut River should not be used for the transportation of logs, masts and spars from the State of Vermont to the State of Connecticut, a very different question would have been presented.   That question does not arise, and need not be discussed.   That it is competent for the Legislature of a State to prescribe the mode in which its ways shall be used to avoid collision and conflict, and to prevent injury to persons or property rightfully thereon, and to prevent obstructions therein, cannot be questioned ; and such legislation has no relation to, and does not interfere with, commerce between the States.   The section of the law declares in its terms the object and purpose of its provisions.   It requires logs, masts and spars to be so arranged that they may be controlled by those having them in charge, and its purpose is to prevent damage to dams and bridges, lawfully erected upon and across the river. Neither a log nor any number of logs floating upon the surface of a stream, uncontrolled and uncontrollable, is navigation or commerce.

The case perhaps most strongly relied upon by the defendant, that of *Railroad Co.* v. *Husen, ubi supra,* bears no analogy in its facts to the case at bar. The Legislature of Missouri had undertaken to enact that cattle from Texas should not be transported through the State of Missouri except in the particular mode pointed out in its statute. The law did not apply to any great river as a highway, nor to any of the ordinary public roads of the State; but to the mode of transportation within railway cars. If the State of Missouri had enacted a law that no cattle from Texas should be driven through that State upon its highways into another State for sale, it may be conceded that the decision of the Supreme Court of the United States in *Railroad Co.* v. *Husen* would have been applicable, and that such legislation was not within the authority of the State. To present any analogy between the passage of cattle through a State and the facts of the case at bar, the provision of law should be that no cattle from anywhere should be allowed to be at large in the street without a keeper; and when it has been decided by any competent authority that it is not within the power of a State Legislature by law to forbid cattle being at large in a highway without a keeper, there will be some foundation for the claim that a State has no power to prevent logs, masts and spars, uncontrolled and uncontrollable, from floating down the stream, carrying with them bridges and dams, and destroying every variety of boat and vessel employed in useful and lawful commerce.

The defendant, however, relies with much confidence upon the decision by the Supreme Court of Maine in the case of *Treat* v. *Lord,* 42 Maine, 552. It is contended that, by the decision in that case, the right of every person to float logs upon navigable waters is absolute, and the power to regulate it is alone in Congress. No such principle is embraced within that decision. Upon the other hand, the right of the State to legislate upon the subject is upheld as absolute, even to the extent of deciding that the use of such stream may be absolutely forbidden by the Legislature. The plaintiff in that case contended that, by a grant of five thousand acres of land made by the Legislature of the Commonwealth of Massachusetts, on February 7, 1820, he became possessed of the exclusive right to the use of the stream,

upon which his dam was erected, within the limits of his grant, and that such ownership authorized him to construct a dam across the stream because the grant was upon the condition, among other things, that he should give a bond with sureties that he would within two years erect and put in operation a good and sufficient saw-mill and grist-mill on the stream in question, and that he had thus erected such mill, and that said mill at the time of the alleged trespass was standing and in operation. The important question decided by the court was not whether the Legislature had authority to act upon the subject of the use of that stream, but whether, as matter of fact, it had acted. It was stated in that case that there was a distinction between the rights of property in a State and the rights of sovereignty; that the former could be lost by non-use or by disseisin; that the latter could not thus be lost; and in construing the grant to Treat, the court held that the grant was a grant only of property, and was not in any sense a grant of its rights of sovereignty; that the right of every individual to use the waters of such a stream could not be taken away by any grant of the right of property in it by the State, because a grant of the right of property is construed as having been made subject to that public easement which can be destroyed only by an exercise of sovereignty by the Legislature. The opinion in that case is carefully analyzed, and the various head-notes very clearly state the exact points decided, the first of which is in these words: " The State, by virtue of its sovereignty or right of eminent domain, may abridge, control or destroy a public easement in a stream within its limits; but, until it does so by positive legislation, all persons may lawfully enjoy such easement in common with the State." If this proposition is sound, it is clear that the authority of the Legislature is much more extensive than that which has been exercised by the Legislature of Massachusetts. The next essential point decided in that case is that " a conveyance by the State of all its right, title and interest in and to the lands over which a navigable stream flows, does not authorize the grantee, or those claiming under him, to use exclusively or to destroy the public easement in said stream."

Neither of these propositions, nor any other decided in that case, has the slightest bearing upon any question involved in the

present case. There is no intimation that the Legislatuie has not authority to regulate the mode in which the easement should be used; but, on the other hand, the power is expressly asserted in the Legislature, not only to regulate, but to prohibit the exercise of the right; nor is there anything in the report of the case which, by implication even, can be understood as recognizing the fact that a single log or many logs floating uncontrolled, with no power of the owner over them, is either commerce or navigation. All the language of the report implies that the logs were at all times under the control and direction of those driving them. It would be impossible upon any other theory to satisfy the rules of law which were given to the jury in regard to the care and diligence of the defendant, and the respect which he was bound to have for the plaintiff's rights, and that his own must be so exercised as to do the least injury to the plaintiff's property. It would be a mere absurdity to say that the right to use the river for logs tumbled into the stream, and floating down uncontrolled, and carrying with them the plaintiff's dam, is consistent with the law declared in that case.

The case of *Carter* v. *Thurston*, 58 N. H. 104, is no more favorable to the claim of the defendant. In that case it was decided only that any person had the right to make a reasonable use of a public stream; that in such use he was not responsible for any damage done without his fault, that is, that the use itself is not a wrong-doing; but that he is responsible for injury done by his carelessness.

There is no ground for the inference that, in the use of the river as a highway, the Legislature may not make suitable regulations for its more convenient and safe use by persons having equal rights thereon, or that a use in violation of such regulation is authorized under the Constitution of the United States, and cannot be limited by State legislation because such regulation is an interference with interstate commerce.

*Exceptions overruled.*